UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| KATHERINE JETTER, and<br>KATHERINE JETTER LTD. d/b/a the<br>VAULT NANTUCKET,<br><br>        Plaintiff,<br><br>        v.<br><br>BOUTIQUE TERE, INC. d/b/a MARISSA<br>COLLECTIONS, JAY HARTINGTON,<br>MARISSA HARTINGTON, and<br>BURT HARTINGTON,<br><br>        Defendant. | Case No. 25-cv-11491-DJC |

**MEMORANDUM AND ORDER**

**CASPER, J.**                                                                                       **June 21, 2025**

**I.   Introduction**

Plaintiffs Katherine Jetter and Katherine Jetter LTD d/b/a The Vault Nantucket (collectively, "Plaintiffs") have filed this lawsuit against Boutique Tere, Inc. d/b/a Marissa Collections, Jay Hartington, Marissa Hartington and Burt Hartington (collectively, "Defendants") alleging breach of non-competition contract (Count I), breach of a confidentiality contract (Count II), breach of the implied covenant of good faith and fair dealing (Count III), tortious interference (Count IV), unfair and deceptive trade practices in violation of M.G.L. c. 93A (Count V), misappropriation of trade secrets in violation of Mass. Gen. L. c. 93 §§ 42-42G (Count VI), misappropriation of confidential business information (Count VII), conversion (Count VIII), unjust enrichment (Count IX) and seeking declaratory relief (Count X).  D. 1-1.  Plaintiffs now

1

move for a preliminary injunction and/or temporary restraining order to enjoin the Defendants from misappropriating, and/or disclosing Plaintiffs' confidential and trade secret information and requiring them to return that information, opening a store or otherwise competing within fifty miles of The Vault's location on Nantucket and withholding Plaintiffs' inventory.  D. 10; D. 11 at 7.  For the reasons discussed below, the Court DENIES Plaintiffs' motion for injunctive relief, D. 10.

## II.     Standard of Review

The Court recognizes that preliminary injunctive relief "is an 'extraordinary and drastic remedy.'"  Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc., 645 F.3d 26, 32 (1st Cir. 2011) (quoting Munaf v. Geren, 553 U.S. 674, 689-90 (2008)).  To obtain such relief, the Court must consider:  "(i) the movant's likelihood of success on the merits of its claims; (ii) whether and to what extent the movant will suffer irreparable harm if the injunction is withheld; (iii) the balance of hardships as between the parties; and (iv) the effect, if any, that an injunction (or the withholding of one) may have on the public interest."  Corp. Techs., Inc. v. Harnett, 731 F.3d 6, 9 (1st Cir. 2013) (citing Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 15 (1st Cir. 1996)).  "[L]ikelihood of success [on the merits] is the main bearing wall of this framework."  W Holding Co. v. AIG Ins. Co. Puerto Rico, 748 F.3d 377, 383 (1st Cir. 2014) (internal quotation marks omitted) (quoting Ross-Simons of Warwick, Inc., 102 F.3d at 16).  Irreparable harm, on the other hand, is measured "on a sliding scale, working in conjunction with a moving party's likelihood of success on the merits, such that the strength of the showing necessary on the irreparable harm depends in part on the degree of likelihood of success shown."  Gedeon v. City of Springfield, No. 16-cv-30054-MGM, 2017 WL 4212334, at *8 (D. Mass. Feb. 24, 2017) (quoting Braintree Labs., Inc. v. Citigroup Global Mkts., Inc., 622 F.3d 36, 42-43 (1st Cir. 2010)).  The movant "bears the burden of establishing that these four factors weigh in its favor."  Esso Standard Oil Co. (P.R.) v. Monroig-Zayas, 445 F.3d 13, 18 (1st Cir. 2006) (citing

Nieves-Márquez v. Puerto Rico, 353 F.3d 108, 120 (1st Cir. 2003)).

### III.   Factual Background

The following facts are drawn from Plaintiffs' complaint, D. 1-1, their memorandum in support of their motion for injunctive relief, D. 11, Defendants' opposition, D. 20, Plaintiffs' reply, D. 23, and the parties' supportive filings, including affidavits.

At The Vault, the core of Jetter's business is high-end jewelry, but she represents that the store also sells at least some apparel and accessories. D. 1-1 ¶¶ 2, 24; D. 23-1 ¶¶ 5, 7.[1] As is common among Nantucket businesses, The Vault operates seasonally, opening from approximately May through October, during Nantucket's warm weather months. D. 1-1 ¶ 26; D. 21 ¶ 17; see D. 21-4 (website for The Vault, indicating that it is open seasonally from June to September). In addition, Jetter hosts trunk shows, events and "pop-up" shops on the island. D. 1-1 ¶ 2; D. 23-1 ¶ 7.

Marissa Collections, based in Florida, was founded in 1975 by Marissa and Burt Hartington, who now own the business with their son, Jay Hartington ("Hartington"), who serves as its Chief Executive Officer ("CEO"). D. 1-1 ¶¶ 3, 28; D. 21 ¶¶ 1-3; D. 23-1 ¶ 8. Marissa Collections sells fine jewelry, men's and women's clothing and accessories and has brick-and-mortar stores in Palm Beach and Naples, in addition to an online store, through which it has served over sixty clients from and on Nantucket since 2013, selling over $2 million worth of merchandise. D. 1-1 ¶¶ 3, 28; D. 21 ¶¶ 4-5, 20. Marissa Collections, like The Vault, hosts trunk shows, events and pop-up shops. D. 1-1 ¶ 29. In the summer 2022, Marissa Collections hosted its first fashion

---

[1] Defendants insist that The Vault sells only jewelry. D. 21¶ 12. Although jewelry seems to be the Company's primary focus and The Vault's website advertises only jewelry, see The Vault Nantucket, https://www.thevaultnantucket.com/ (last visited June 20, 2025), The Vault also states on its website that it "offer[s] designer apparel for women." D. 12 at 43.

show and popup in Nantucket, which Jetter attended. D. 21 ¶¶ 22-25. The event was a success, and Marissa Collections sold over $50,000 of products in just three hours. Id. ¶ 24. As a result of this success, Marissa Collections began considering a brick-and-mortar store in Nantucket and connected with a real-estate agent to begin looking for a property in August 2022. D. 21 ¶¶ 26-31.

In 2014, Jetter became a vendor for Marissa Collections, and, over the years, built a friendly and professional relationship with Hartington, whom she would consult for business advice. D. 21 ¶¶ 9-15; see D. 21-2; D. 21-3. Originally, per their vendor relationship, Jetter would provide Marissa Collections with inventory on consignment. D. 21 ¶ 19; D. 23-1 ¶¶ 64-66. Later, they transitioned to a relationship in which Marissa Collections would provide Jetter with $40,000 up front, which would be repaid through Marissa Collections' sales of Jetter's inventory. D. 21 ¶ 19. In addition, Marissa Collections would pay the wholesale invoices of jewelry, which were not deducted from the $40,000 working capital deposit. Id.

In late winter/early spring 2023, Jetter approached Hartington to explore a potential partnership or sale of The Vault to Marissa Collections. D. 21 ¶¶ 32-33; D. 23-1 ¶ 16. On April 12, 2023, in advance of a meeting with Jetter's business advisor, Jetter sent Hartington an email titled "NDA PDF The Vault 4-12-23.pdf," and said, "see attached and let me know if you have any questions, don't worry about the form at the bottom." D. 21 ¶¶ 34-35; D. 21-8 at 2-3. In addition to various provisions regarding non-disclosure of confidential information, the attached agreement included a clause stating that the "[r]ecipient agrees not to compete with the Business within 50 miles of any location of the Business." D. 21-8 at 4. Hartington has attested that given his "longstanding personal and professional relationship" with Jetter and "Jetter's nonchalant description of the document," he "assumed it was a standard NDA" and he signed it without

consulting with counsel. D. 21 ¶ 37. On October 23, 2024, Jetter e-mailed again and asked, "[c]an I be super annoying and ask you to sign this new NDA between just us?" D. 21-9 at 2-3. The attached agreement included a similar noncompete clause and similar provisions regarding confidentiality. Id. at 4. Hartington has attested that he signed the second agreement for the same reasons as he signed the first. D. 21 ¶ 38. In the period following April 2023, Marissa Collections continued to sell to clients on Nantucket. D. 21 ¶ 39.

Plaintiffs allege that in reliance upon these contractual safeguards and assurances, Jetter disclosed confidential and proprietary business information related to The Vault, including "detailed sales data and forecasts, profit margin models and strategies, employee compensation details, seasonal revenue patterns and various market analyses." D. 1-1 ¶¶ 6, 45-46; see D. 23-1 ¶¶ 21-26, 28, 31-34, 36, 41, 45-48. The parties dispute the value of the information Jetter provided after these agreements were signed. According to Hartington, the information Jetter provided was "not audited or otherwise verified." D. 21 ¶ 44. This information included a business valuation Jetter had created, sales data, projections and personnel information. See D. 23-1 ¶¶ 45-47 (and referenced exhibits). According to Hartington, "Jetter repeatedly altered such information and explanations when faced with very basic inquiries about The Vault." D. 21 ¶ 44. For example, he has attested that Jetter reported very different salaries for the same employee. Id. Hartington has also attested that neither he "nor anyone associated with Marissa Collections" used "any information concerning The Vault for any reason whatsoever." D. 21 ¶ 55.

Dissatisfied with the materials Jetter had provided, Hartington sought additional information about The Vault in October 2024. See D. 21-10; D. 21 ¶¶ 44-45. In response, Jetter indicated she would not "send this material" until "we have a reasonable range of valuation." D. 21-10 at 3. On January 2, 2025, Hartington raised further concerns that some of the financial

information provided in Jetter's spreadsheets was inaccurate, noting "[i]t is challenging to agree on ballpark numbers without audited financials or answers to operational questions regarding the desired assets." D. 21-11 at 3. Jetter responded, "we do need to have a ballpark agreement in place before we go all the way with opening every detail of my books to you." D. 21-11 at 3. On January 10, 2025, Jetter said she would "provide revenue and gross profit on every item sold in 2024" if the companies' "discussions continue to progress." D. 21 ¶ 50. Ultimately, the parties' discussions regarding a partnership or sale dissolved. D. 21 ¶¶ 51-53. According to Hartington, this was in part due to Jetter's "failure to provide requested information about The Vault." D. 21 ¶ 52.

After the parties terminated their discussions regarding a potential merger or acquisition, Jetter ended the companies' inventory sharing relationship. D. 21 ¶ 62. Plaintiffs allege that the Defendants have since refused to return jewelry they held under this arrangement, which they assert is valued at nearly $250,000. D. 1-1 ¶¶ 10, 61-67; D. 12 at 53-55. Defendants insist that they offered to return this jewelry in exchange for return of their $40,000 deposit, "payment of dues owed, and a reimbursement of marketing expenses incurred" as a result of Jetter's cancellation of a trunk show in Naples. D. 21 ¶ 62. Jetter rejected this offer. Id. ¶ 63. According to the Plaintiffs, no such marketing fees are owed (and would be unrelated to the inventory). D. 23 at 12. Jetter insists that she offered to return the $40,000 deposit within seven days of Marissa Collections' receipt of the jewelry, and that one of Jetter's employees "even traveled to Florida, checkbook in hand" to pay the $40,000 and retrieve it. Id.; D. 23-1 ¶ 68.

On May 9, 2025, Marissa Collections announced that it would open a Nantucket store, 0.2 miles away from The Vault. D. 1-1 ¶¶ 4, 54-55; D. 23-1 ¶ 63. As Hartington has attested, there is only one "significant retail area" in Nantucket. D. 21 ¶ 30. In its Instagram post announcing

this opening, Marissa Collections listed all of the designers it planned on featuring, none of whom are jewelry designers. D. 21 ¶ 58; D. 21-12 at 2-3. On May 12, 2025, Marissa Collections issued a press release regarding the opening, noting that "[w]hile known for its fine jewelry offerings, the Nantucket boutique will focus exclusively on fashion and seasonal collections" from certain apparel designers. D. 21 ¶ 59; D. 21-13 at 2. In addition, Defendants' Nantucket store will not sell fashion from any of the same designers that The Vault carries. D. 21 ¶ 60.

IV.   **Procedural History**

Plaintiffs commenced this action in Nantucket Superior Court on May 19, 2025, D. 1-1, and Defendants removed this action to this Court on May 23, 2025, D. 1. Plaintiffs now move for injunctive relief against Defendants. D. 10. On June 16, 2025, the Court heard the parties on the pending motion and took the matter under advisement. D. 27.

V.   **Discussion**

   A.   **The Likelihood of the Success on the Merits**

      *1.   Enforceability of Non-Competition Agreement*

Plaintiffs have not established a likelihood of success on the merits as to the enforceability of the non-competition clauses, both due to their breadth and lack of consideration. "In Massachusetts, a non-compete agreement is enforceable only if 'it is necessary to protect a legitimate business interest, reasonably limited in time and space, and consonant with the public interest.'" SpeeDee Worldwide, LLC v. Toppa, 729 F. Supp. 3d 125, 130 (D. Mass. 2024) (quoting Boulanger v. Dunkin' Donuts, Inc., 442 Mass. 635, 639 (2004)). Here, the non-compete spans fifty miles, including all of Nantucket and some of Barnstable County, and applies indefinitely. D. 21-8 at 4; D. 21-9 at 4. Plaintiffs highlight several cases in which Massachusetts courts have enforced restrictive covenants with a similar geographic scope. D. 11 at 15-16 (citing SpeeDee

7

Worldwide, 729 F. Supp. 3d at 130; Rooterman, LLC v. Belegu, 24-cv-13015-PBS, 2025 WL 1088043, at *5 (D. Mass. Apr. 11, 2025); Sulmonetti v. Hayes, 347 Mass. 390, 395 (1964); Wells v. Wells, 9 Mass. App. Ct. 321, 325-26 (1980); Furlong v. Donarumo, No. SU-cv-200800155, 2013 WL 12527857, at *16 (Mass. Super. Ct. May 24, 2013); Acuity Partners, Inc. v. Kahians Carpet One, Inc., PL-cv-2001-01509B, 2005 WL 4926912, at *1 (Mass. Super. Ct. May 31, 2005); Boulanger, 442 Mass. at 644).

These cases, however, involve substantial consideration which is lacking here: either the proceeds from a sale of a business, or the profits associated with a franchiser/franchisee relationship. See SpeeDee Worldwide, 729 F. Supp. 3d at 127-28; Rooterman, LLC, 2025 WL 1088043, at *1-2; Sulmonetti, 347 Mass. at 392-93; Wells, 9 Mass. App. Ct. at 321; Furlong, 2013 WL 12527857, at *1-5; Acuity Partners, Inc., 2005 WL 4926912, at *1; Boulanger, 442 Mass. at 635-36. In this context, a non-competition agreement may be consonant with the public interest. As one Massachusetts court has explained, "[i]n the [sale of a business] situation there is more likely to be equal bargaining power between the parties; the proceeds of the sale generally enable the seller to support himself temporarily without the immediate practical need to enter into competition with his former business; and a seller is usually paid a premium for agreeing not to compete with the buyer." Alexander & Alexander, Inc. v. Danahy, 21 Mass. App. Ct. 488, 496 (1986).

On the other hand, as Defendants note and Plaintiffs do not point the Court to any cases to the contrary, "[n]o court in Massachusetts . . . has recognized the validity of (much less enforced) a non-compete in the context of two parties simply exploring a merger and/or acquisition, and exchanging business information, but who do not, ultimately, consummate a sale." D. 20 at 8. Here, the only consideration supporting the non-competition clauses is Plaintiffs' provision of

confidential information, which Hartington has attested Defendants are not using. D. 21 ¶ 55. This is insufficient to established Plaintiff's likelihood of success on the merits as to the enforceability of the non-compete.[2]

Plaintiffs suggest this Court could exercise its "broad equitable power" to reform the non-compete by imposing a three-year time limit. D. 11 at 17-18. Here, where such a reformed clause would still bar Defendants from operating on the entire island of Nantucket and Defendants attest that they are not using Plaintiffs' confidential information, D. 21 ¶ 55, there is at least a question of fact with respect to whether such a reformed non-compete would be necessary to protect a legitimate business interest. See D. 20 at 13 (suggesting that "[i]t is just as plausible that the non-compete's duration should be interpreted by this Court to be the period of time 'for the Recipient's evaluation of a transaction,' as that is the only time period specified in the non-compete"); Sodexo Operations, LLC. v. Abbe, 382 F. Supp. 3d 162, 165 (D. Mass. 2019) (noting that "factual disputes reduce [plaintiff's] likelihood of success on the merits and caution against injunctive relief"). The Court, therefore, declines to reform the agreement.

        2.     *Purported Breach of Non-Competition Agreement (Count I)*

Even if this Court were to conclude that Plaintiffs are likely to establish that the noncompetition provisions are enforceable, Plaintiffs have, nonetheless, failed to establish that they are likely to succeed on the merits of their breach of non-competition agreement claim because there is at least a question of fact with respect to whether the Marissa Collections'

---

[2] Defendants dispute that Plaintiffs even met their obligations under the relevant contracts, 21-8 at 4; D. 21-9 at 4, insisting that Plaintiffs did not share information in good faith. See D. 20 at 15-16. Plaintiffs insist that they did, D. 23 at 11. Given the Court's conclusion that the provision of confidential information is insufficient consideration to support a non-competition clause of this breadth in these circumstances, the Court need not reach the question of whether the Plaintiffs provided Defendants with confidential or trade secret information, or the value of such information provided.

Nantucket location would compete with the Vault. Neither of the non-competition clauses defines competition. D. 21-8 at 4; D. 21-9 at 4. Plaintiffs insist that The Vault and Marissa Collections compete because both feature jewelry from the same designers' lines, work with the same vendors, have overlapping clientele and market to the same customer base. D. 1-1 ¶¶ 3, 30; D. 11 at 19-20. Even if this may be true as to an overlapping clientele and market, there is insufficient evidence on this preliminary record to conclude that the Marissa Collections Nantucket location will compete with The Vault. For one, the Marissa Collections Nantucket store will sell only "fashion and seasonal collections" from apparel designers. D. 21 ¶ 59; D. 21-13 at 2. Even if The Vault also sells apparel, see D. 12 at 43, as Plaintiffs allege, apparel does not appear to be its primary focus, see The Vault Nantucket, https://www.thevaultnantucket.com/ (last visited June 20, 2025), and in any event, the Marissa Collections Nantucket store will not feature apparel from any of the same designers as The Vault. D. 21 ¶ 60.

Plaintiffs urge that Defendants may sell jewelry in the future and note that Marissa Collections advertises jewelry as part of its "East Coast Summer Campaign," D. 23 at 4-5, 9-10, but this Court will not enjoin the opening of Marissa Collections' Nantucket store based upon such a hypothetical risk. See City of Los Angeles v. Lyons, 461 U.S. 95, 102 (1983) (explaining that to obtain injunctive relief, a plaintiff must demonstrate a "threat of injury" that is "both real and immediate, not conjectural or hypothetical") (internal citations and quotation marks omitted).

Since it remains contested whether Marissa Collections will compete with The Vault and questionable whether the breadth of the non-compete provision is enforceable here, Plaintiffs have failed to meet their burden of demonstrating that they will likely succeed on the merits of their claim that Defendants breached the non-compete provisions of the two agreements. See Rohm & Haas Elec. Materials, LLC v. Elec. Circuits Supplies, Inc., 759 F. Supp. 2d 110, 125 n.107 (D.

Mass. 2010) (explaining that "when courts are faced with affidavits at odds and must make a credibility determination between them, courts generally do not issue a preliminary injunction, but rather leave the issue for a jury to resolve").

> 3. *Purported Breach of Confidentiality Agreement and Purported Misappropriation of Trade Secrets and Confidential Business Information (Counts II, VI, VII)*

Plaintiffs also assert that Defendants breached the confidentiality provisions of these agreements, D. 11 at 20, and misappropriated their trade secrets, D. 11 at 21-23, but they have failed, on the present record, to present any evidence that either breach has occurred. The confidentiality provisions of the agreements provide, "Recipient will not utilize, now or at any time in the future, proprietary information or trade secrets that are provided in any manner other than to evaluate a possible transaction with the Business," "Recipient will not utilize this information in the conduct of Recipient's or any other party's present or future business(es) or utilize it to enter into or compete with the Business or assist any other party to do so." D. 21-9 at 4; see D. 21-8 at 4.

Plaintiffs do not provide any evidence to suggest that Defendants breached these clauses, but instead urge that the short time period between Defendants' acquisition of Plaintiffs' confidential information and Defendants' opening of their brick-and-mortar store reflects their "improper acquisition and use of The Vault Parties' confidential information to gain a competitive market advantage both now and into the future to directly and unfairly compete against Plaintiffs' business." D. 11 at 11-12. Defendants' actions may instead, however, reflect their pre-existing plan to open a store in Nantucket, see D. 21 ¶¶ 26-31, and their ignorance that they had agreed to a non-compete, the existence of which was never flagged by Jetter, who included the non-compete clauses in contracts she referred to as NDAs. See D. 21-8 at 2-4; D. 21-9 at 2-4; D. 21 ¶¶ 37-38.

11

In short, this Court cannot assume that on this record, Defendants' actions reflect nefarious intent with respect to Plaintiffs' confidential information and purported trade secrets. Accordingly, Plaintiffs have not met their burden of demonstrating that they will likely succeed on the merits as to these claims.

The agreements also include a clause stating, "[i]f Recipient decides not to pursue the proposed Transaction, Recipient will advise Owner of this fact and return to Owner all Information furnished to Recipient without keeping copies of it." D. 21-9 at 4; see D. 21-8 at 4. While Defendants have not yet returned Jetter's information, there is now an attestation by Hartington that neither he "nor anyone associated with Marissa Collections" used "any information concerning The Vault for any reason whatsoever." D. 21 ¶ 55. Where the purpose of the clause is to ensure that Defendants do not use Plaintiffs' confidential information, Plaintiffs have not shown any non-speculative basis for concluding otherwise, Defendants have affirmed that they are not using such information and their counsel represented at the motion hearing that they have retained such information only for the purpose of defending their clients in this litigation, no further action by the Court is warranted at this time.

### 4.   *Alleged Conversion (Count VIII)*

At this juncture, the Court does not conclude that Plaintiffs are likely to succeed on the merits of their conversion claim. A claim for conversion arises when a defendant "intentionally or wrongfully exercise[s] acts of ownership, control or dominion over personal property to which he has no right of possession at the time." Beliveau v. Ware, 87 Mass. App. Ct. 615, 618 (2015) (internal citation and quotation marks omitted). At this stage, there is a question of fact regarding whether Defendants' control or dominion over The Vault's inventory is wrongful where Defendants insist that they "offered to process the return of the inventory in exchange for the

deposit, payment of dues owed, and reimbursement of marketing expenses incurred due to Jetter's cancellation of a trunk show in Naples," D. 20 at 18; D. 21 ¶¶ 62-63, and Plaintiffs insist that they offered to return the $40,000 deposit in exchange for the jewelry, and dispute that any other fees are owed, D. 23 at 11-12.

For all of the aforementioned reasons, Plaintiffs have not shown that they are likely to succeed on their breach of contract, Counts I-II, misappropriation of trade secrets and confidential business information, Counts VI-VII or their conversion claims, Count VIII.[3]

### B.    Irreparable Harm

Having decided that Plaintiffs are not likely to succeed on the merits, the Court need not reach the element of irreparable harm but does so to further underscore why Plaintiffs are not entitled to injunctive relief.  Here, in addition to providing no non-speculative basis that Defendants have or will misappropriate their trade secrets, use their confidential information or convert their property, Agero Admin. Serv. Corp. v. Campolo, 366 F. Supp. 3d 170, 174-75 (D. Mass. 2019) (concluding that "[p]laintiff's mere speculation that [defendants] will use [its] confidential information to unfairly compete does not establish irreparable harm"); Charlesbank Equity Fund II v. Blinds To Go, Inc., 370 F.3d 151, 162 (1st. Cir. 2004) (explaining that "[a] finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store"), Plaintiffs have not demonstrated that damages would be an inadequate remedy for any harm they might suffer.

As the First Circuit has explained, "[t]he necessary concomitant of irreparable harm is the inadequacy of traditional legal remedies.  The two are flip sides of the same coin:  if money

---

[3] Although Plaintiffs assert ten claims in the complaint, they addressed only Counts I, II, VI, VII and VIII in their motion for injunctive relief.  D. 11 at 12-24.

damages will fully alleviate harm, then the harm cannot be said to be irreparable." K-Mart Corp. v. Oriental Plaza, Inc., 875 F.2d 907, 914 (1st Cir. 1989). If Plaintiffs lose a sale to Defendants due to their use of confidential information or trade secrets, the profits lost from that sale should be quantifiable. See Rohm, 759 F. Supp. 2d at 127 (explaining that "a loss of customers (or customer goodwill) do[es] not necessarily constitute irreparable injury"). The absence of irreparable harm is particularly clear for Plaintiffs' conversion claim, for which they have alleged the value of the inventory they insist Defendants have converted. D. 1-1 ¶ 10 (alleging that defendants have refused "to return nearly $250,000 of Ms. Jetter's jewelry inventory that they held on consignment at Marissa Collections' Palm Beach Store"). Accordingly, Plaintiffs have not established the required element of irreparable harm.

Having determined that Plaintiffs cannot demonstrate a likelihood of success on their claims and have not demonstrated a likelihood of irreparable harm absent an injunction, the Court need not reach the factors of balancing the equities between the parties, and the public interest. See Wine & Spirits Retailers, Inc. v. Rhode Island, 418 F.3d 36, 46 (1st Cir. 2005) (expressing that "[t]he sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity" (citation and internal quotation marks omitted)).

## VI. Conclusion

For the foregoing reasons, the Court DENIES Plaintiffs' motion for injunctive relief. D. 10.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge